**TRISTAR PICTURES, INC., Petitioner-cross-respondent-Appellant,**

v.

**DIRECTOR'S GUILD OF AMERICA, INC., Respondent-cross-petitioner-Appellee.**

No. 96–55991.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1997.

Decided Nov. 4, 1998.

Mark A. Wasserman, Mitchell, Silberberg & Knupp, Los Angeles, California, for petitioner-cross-respondent-appellant.

Elliott Williams and David J. Korduner, Directors Guild of America, Inc., Los Angeles, California, for respondent-cross-petitioner-appellee.

Before: BROWNING,* KOZINSKI and TROTT, Circuit Judges.

KOZINSKI, Circuit Judge:

Director Michael Apted was unhappy with the way Tristar Pictures edited his film,

_____
* Judge Browning replaced Judge Gibson, who be-        came unavailable.

*Thunderheart,* for television. With the help of the Directors Guild of America (DGA), Apted sought a pseudonym for the director's credit, for as his name is so is he.[1]

## I

■ Cinephiles believe the director is the true author of a film: It's Coppola's *Godfather,* Spielberg's *Schindler's List* and Verhoeven's *Robocop.* So too when things go badly: It's Coppola's *One from the Heart,* Spielberg's *Lost World* and Verhoeven's *Showgirls.* With his reputation on the line, Apted was concerned when he learned that Tristar would shorten *Thunderheart* by nearly half an hour in order to show it on commercial television.[2] Tristar asked Apted to help trim the movie from 118 minutes, its running time in theatres, down to 90 minutes (a two-hour slot minus commercials). Apted refused and insisted that *Thunderheart* be shown in its entirety. Tristar decided to proceed over Apted's objection and hired an editor who made 270 separate cuts totaling 22 minutes, sped up the credits to steal two more minutes, and compressed the rest of the film electronically to gain another four. Apted then asked that his name be taken off the edited picture, but Tristar refused. After an arbitrator ruled in favor of Apted, Tristar brought a petition in state court claiming that the arbitrator had overstepped his authority. The DGA then removed the case to federal court, and the district court upheld the award.[3] Tristar appeals.

## II

Apted's relationship with Tristar is governed by a collective bargaining agreement (the Basic Agreement) negotiated between the studios and the DGA. Two clauses of the agreement are relevant to this appeal. One of them, section 8–211, governs claims by a director that he is entitled to a pseudonym. In order to avail himself of this remedy, a director must first persuade the Director's Council of the DGA that he is entitled to a pseudonym. If the Council assents, the pseudonym question is presented to a joint panel composed of two representatives from the studio and two from the DGA. If a majority of the joint panel sides with the director, the film's directing credit goes to a fictitious director, typically "Alan Smithee."[4] If not, the studio may continue to use the director's name.

The second relevant provision is the Basic Agreement's arbitration clause. Section 2–101 sets forth the arbitrator's jurisdiction, which embraces the capacious range of "[a]ll grievances, disputes or controversies over the interpretation or application" of the Basic Agreement. The arbitrator's authority can be invoked under a normal arbitration procedure, set forth in section 2–300 of the Basic Agreement, or under an expedited arbitration procedure, found in section 2–400.

In this case, the Director's Council agreed with Apted and on July 7th called for the convocation of a joint panel to consider whether Apted was entitled to a pseudonym. As of July 12, 1995, however, just six days before *Thunderheart* was scheduled to air, the joint panel had not yet met.[5] The DGA therefore called for expedited arbitration of

---

1. 1 Samuel 25:25.

2. *Thunderheart* tells the story of a young FBI agent (Val Kilmer) sent to the Pine Ridge Sioux reservation in the 1970s to investigate the violence between traditionalist and progressive factions. The film was shot on location in South Dakota with an indigenous supporting cast. Apted explains that he made a moral commitment to the Sioux about the type of film *Thunderheart* would be, and the cut version wasn't it. For example, Tristar cut a multi-minute pow-wow scene, which Apted says infringed on his creative role as director and violated his moral obligation to present a well-rounded picture of the Sioux tradition.

3. This case is not moot, even though *Thunderheart* has already aired, because Tristar maintains that it is entitled to show the film again, minus the disclaimer or the pseudonym.

4. The origin of the pseudonym "Alan Smithee" is unknown. *See generally* Eben Shapiro, *Despite Disdain, a Legendary Director Endures,* Wall St. J., Apr. 19, 1996, at B1.

5. The DGA blames Tristar for the delay, because Tristar failed to appoint its representatives to the joint panel until July 13. Because the arbitrator did not place any weight on this allegation, we need not concern ourselves with the reason for the delay and it plays no role in our decision.

the dispute under section 2–400. The arbitration took place two days later.

The arbitrator did not rule on Apted's pseudonym claim, explaining that this was a dispute "most appropriate[ly]" resolved by the joint panel. But he agreed that Tristar's cuts were so severe as to breach Tristar's duty of good faith and fair dealing set forth in section 7–1502 of the Basic Agreement. As a result, the arbitrator made a conditional award: If the joint panel did not grant Apted a pseudonym, Tristar would have to show a disclaimer that reflected Apted's view of the edited version.[6] The awarded disclaimer read:

> This film is not the version originally released. 22 minutes have been cut out. The director, Michael Apted, believes this alteration changes the narrative and characterization and is not associated with it. The film has also been electronically speeded up. The director believes that this alteration changes the pace of the performance and is not associated with it.

This put Tristar in a box. If it used Apted's name, it would be forced to air the disclaimer, which would make it look as if the film had been butchered. If it used a pseudonym, it would lose the attraction of a respected director. Tristar chose what it saw as the lesser of the two evils, and when *Thunderheart* aired on Fox, sans disclaimer, it carried the label "An Adam Smithy Film."[7]

### III

■ Tristar argues that the arbitrator lacked jurisdiction over the dispute. Under Tristar's reading of the Basic Agreement, all disputes concerning the editing of a film are governed by the pseudonym clause, and the only remedy available to a director unhappy with the studio's editing decision is to seek a pseudonym. While the language of the arbitration clause is very broad, Tristar argues,

it should not be read so as to render superfluous the more specific procedure in the pseudonym clause, which is calibrated to resolve disputes about whether edits made to a movie so change its character as to render it no longer the director's work.

Tristar's argument is not without force. The pseudonym procedure does contain a carefully negotiated mechanism for dealing with precisely the type of dispute that arose between Apted and Tristar. Notably, the procedure gives the studio considerable leverage in resisting a claim by the director. Because the joint panel is made up of an equal number of members nominated by the studio and the DGA, a director can only obtain a pseudonym by persuading at least one member nominated by the studio; a tie vote denies the director the pseudonym. By contrast, the studio has no particular leverage for resisting a ruling by the arbitrator—other than the inertial force of being the nonmoving party. The pseudonym clause also gives the director only one possible remedy—a pseudonym—while (as we see in this case) the arbitrator can grant other types of relief. Finally, the contract provides no standard for obtaining relief from the joint council, while the arbitrator is limited to any ground available under the terms of the contract and applicable principles of contract law, such as breach of the covenant of good faith and fair dealing. Given these differences, it would seem almost foolish for a director to avail himself of the pseudonym procedure rather than seeking relief under the arbitration clause. Indeed, a director might proceed under the pseudonym procedure and, if unhappy with the result, then seek a separate remedy under the arbitration clause over the same issue.

Tristar also notes that the arbitrator himself saw a tension between the broad sweep of the arbitration clause and the pseudonym

---

**6.** Tristar had already indicated that it planned to run a standard disclaimer, reading: "This film has been modified from its original version. It has been formatted to fit this screen and edited to run in the time allotted and for content."

**7.** The record does not explain why Tristar switched from Alan Smithee to Adam Smithy. It

could be that Alan is developing a reputation. *See* Thomas Goetz, *King of the Bs: Appreciating Alan Smithee,* Village Voice, Sept. 2, 1997, at 78 ("The best anyone in Hollywood has to say about director Alan Smithee is that he gets the job done.").

procedure. He therefore found that arbitration was not the "most appropriate way" to resolve a dispute over a pseudonym, noting that the parties had established the pseudonym clause as the method for resolving disputes of that sort. Seizing upon this concession by the arbitrator as to the scope of his authority, Tristar argues that the pseudonym provision carves out an area where even the expansive arbitration clause does not reach. By making the arbitration award provisional upon whether a pseudonym is granted, Tristar claims, the arbitrator impermissibly tread upon ground he admitted he had no right to occupy.

Were we interpreting the Basic Agreement in the first instance, this would be a difficult case, but we are not. We are reviewing the award of an arbitrator who ruled on this issue and held that Tristar had violated the implied promise of good faith and fair dealing contained in Article 7 of the Basic Agreement. Tristar's challenge to the arbitrator's jurisdiction fails, not only because of the broad language of the arbitration clause, but also because of Tristar's prior actions. Although Tristar did suggest at the arbitration hearing that the arbitrator had no authority to decide certain issues, it chose to argue that the arbitrator lacked authority rather than simply refusing to come to the table. In this manner, Tristar "by [its] conduct evinced clearly its intent to allow the arbitrator to decide not only the merits of the dispute but also the question of arbitrability." *George Day Constr. Co. v. United Bhd. of Carpenters,* 722 F.2d 1471, 1475 (9th Cir. 1984); *see also Ralph Andrews Prods., Inc. v. Writers Guild of Am., West,* 938 F.2d 128, 130 (9th Cir.1991) ("A party may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrator to act."). Instead of resting on its present contention that the arbitrator could not grant Apted the relief he sought, Tristar put on evidence of its good faith in editing the film, tacitly admitting that it was plausi-

ble for the arbitrator to assume jurisdiction over the dispute.[8]

■ Tristar's complaint that the arbitrator effectively forced it to grant Apted a pseudonym, thereby circumventing section 8–211 of the Basic Agreement and impermissibly extending the limits of his jurisdiction, also fails. Our review of the scope of an arbitrator's award is extremely narrow: We may ask only "whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement." *Desert Palace, Inc. v. Local Joint Executive Bd. of Las Vegas,* 679 F.2d 789, 793 (9th Cir.1982); *accord Van Waters & Rogers, Inc. v. International Bhd. of Teamsters,* 56 F.3d 1132, 1135 (9th Cir.1995). The Basic Agreement gives the arbitrator ample leeway in fashioning remedies: Section 2–501 empowers the arbitrator "to require [the studio] to change or re-do any film titles ... or to order any other reasonable relief the Arbitrator deems appropriate in the circumstances, whether relating to credit on the screen or in advertising or any other arbitrable matter...." This clause invokes the rule that "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The arbitrator's ruling that the covenant of good faith and fair dealing gives an aggrieved director more remedies than just seeking a Smithee is not completely implausible.

Tristar also seems to argue that the arbitrator abused whatever authority he did have by making his award conditional on the actions of the joint panel, effectively forcing Tristar to give Apted a pseudonym. But the arbitrator was entitled to consider the possibility that his remedy might be rendered redundant if the joint panel awarded a Smithee. If the arbitrator had authority to or-

8. This case is unlike *Ralph Andrews Productions,* where we held that an individual who appeared at an arbitration hearing to defend the interests of his closely held corporations, but objected to being bound personally by the arbitrator's ruling, was not bound. There, Andrews himself was a party to neither the contract nor the collective bargaining agreement, and "clearly and unequivocally objected to being named a party to the arbitration." 938 F.2d at 130.

der the disclaimer, he surely had the lesser power of awarding the disclaimer only in the absence of certain conditions. Further, we observe that the disclaimer didn't take away the studio's right, arguably granted by section 7–509 of the Basic Agreement, to edit the film as it sees fit. It only required Tristar to disclose Apted's view of the changes Tristar made to his film.

Tristar finally argues that affirming this award will create a per se rule prohibiting studios from editing movies for television. We are unconvinced that a single award will have any such effect. Although section 2–309 says that awards interpreting a term of the Basic Agreement are binding on the DGA and the studio, it also instructs that "in any subsequent arbitration ... involving an interpretation of the same term or terms of the [Basic Agreement], the Arbitrator may determine whether or not, as a result of the different combination of facts, the prior arbitration award is relevant or determinative of the issue in such subsequent arbitration." Furthermore, if the arbitrator's decision was indeed so far removed from the spirit of the agreement, the parties are free to renegotiate the governing rules to preclude such awards in the future.

We are bound by the very deferential standard of review that we must give arbitral decisions. "Courts ... do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.... [T]hat a court is convinced [an arbitrator] committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct. 364. Regardless of whether this is the solution that we would come up with through our own independent interpretation of the Basic Agreement, we must abide by the arbitrator's plausible interpretation of the agreement.[9]

**AFFIRMED.**

---

9. Citing no cases, Tristar also claims that the arbitrator's evidentiary rulings violated due process. We see no reason to depart from our usual deference to the procedural rulings of arbitrators. *See, e.g., Pack Concrete, Inc. v. Cunningham,* 866 F.2d 283, 285 (9th Cir.1989).